## Case No. 10,703.

### The PANAMA.

[Olc. 343.] [1]

District Court, S. D. New York. April, 1846.

BOTTOMRY—DEBT AT RISK—MORTGAGEE—MASTER AND OWNER—REMNANTS—DAMAGES SUSTAINED BY CHARTERER.

1. A bottomry bond, executed by the master of a ship as master, if he be at the time owner, also. will impart to the holder the same rights and privileges as if given in the character of owner.

2. An agent or broker who purchases a vessel for his principal, at the same time lending him money with which to pay the price, and taking the bill of sale in his own name to secure the repayment of the loan and interest together with his commissions on the purchase, is mortgagee, and not owner of the vessel.

3. The owner of a ship may bottomry her abroad to secure a loan of money, or his personal liabilities for the ship or voyage, provided the debt be put at risk, without regard to the necessity of the ship, or his inability to obtain credit or supplies by other means, or the receipt of the consideration before the ship went to sea. It is not necessary to the validity of a bottomry that the loan or supplies shall have been already received when the bond is executed, if the credit was upon the faith that a bottomry security should be given.

[Cited in The Archer, 15 Fed. 279.]

4. A bottomry of a ship in a foreign port by her owner is valid, although a part of the loan for which it is given consists of a bill of exchange drawn by the bottomry lender on the home port of the ship.

5. The credit of the bottomry lender, given in aid of the ship or owner in a foreign port. is a sufficient consideration to support a bottomry security. But a court of admiralty may call for proof that such credit or liabilities had been actually satisfied by the lender before decreeing an enforcement of the bottomry.

6. When the owner and mortgagee of a ship both appear and file answers to the libel of a bottomry holder, it is competent for each to claim in his answer or by a separate petition, that the proceeds of the vessel, after satisfaction of the bottomry security, be paid to him.

7. On such mode of proceeding the court may at its discretion adjudge prospectively between the contestants the method of distribution of the avails of the ship, or may defer the decision until her proceeds are paid into the registry; and may, also, if the case is difficult or important, direct the parties to litigate their claims to the fund by formal suit.

8. Whatever mode of procedure is pursued, a party proved to be a mortgagee, after admitting in his answer to the original action that the bottomry security is valid and consenting to a decree of sale of the ship under it, cannot set up a title to the ship in himself as absolute owner and not mortgagee, in bar of the claim of the bottomry borrower to a share in the remnants remaining in court.

9. In such collateral proceeding the owner of the ship may defeat the claim of a mortgagee to such remnants by proof that the mortgage was given on an usurious consideration.

10. But it is not usury for a broker or agent to charge the usual and customary commissions for his services in purchasing a ship, and also to take legal interest on his own moneys advanced towards the purchase, unless it be proved that the commissions were intended by the parties as a means and cover for reserving more than legal interest upon the loan.

11. Quere. Whether the court, in disposing of remnants in the registry, cannot take cognizance of other claims thereto, than those having a lien upon the vessel, or being of a maritime character?

. [Cited in The A. M. Bliss, Case No. 274.]

12. Damages sustained by a charterer of a ship by a breach of the charter contract in the loss or delay of his voyage, through the negligence or fault of the owner, are a lien upon the vessel; and if a mortgagee satisfies the demand and takes an assignment of the claim, he is entitled to come in upon remnants in court for repayment.

[Cited in brief in Fleishman v. The John P. Best, Case No. 4,861; The Archer, 15 Fed. 279.]

The controversy in this action is upon a bottomry bond, and came before the court in two aspects. The owner of the ship and a mortgagee intervened, and filed answers to the libel, and each claimed, as against the other, a right to the remnants and surplus remaining in the registry after satisfaction of the bottomry bond in suit. Separate petitions were also filed by them for such remnants. The owner also contested the validity of the bottomry. The mortgagee admitted it, and consented to a decree to enforce it. The main contestation was in relation to the remnants in court. The owner contended that the mortgagee had no title upon which to found a claim to those remnants; that his mortgage debt was void for usury, and that the other items of his demand were not liens upon the vessel or her proceeds, nor were they of a maritime character. The mortgagee contended that the legal ownership of the vessel was vested in him, and not in his co-claimant, and that accordingly the latter had no standing in court in relation to that fund. Both branches of the cause were brought to hearing the same term, and were argued by the same counsel.

Ogden Hoffman and Mr. Barret, for bottomry holder.

John Anthon, for owner.

F. B. Cutting, for mortgagee.

BETTS, District Judge. This was a suit upon a bottomry bond to the libellant, executed at Hull, England, May 3, 1845, by the claimant Cameron, master of the ship. The libel avers that it was executed by him in his capacity of owner as well as master of the ship, and that the loan secured by the bottomry was duly made and paid to him. The answer admits the claimant was conditional owner at the time, but alleges he gave the bottomry as master only. It denies that the sum named in the bond had been advanced by the libellant when the bottomry was given, or that it is now payable, and alleges that a large portion of the debt was created after the bottomry was given, and the vessel had gone to sea. It was stipulated in writing between the proctors of the parties, that work and materials were furnished the ship

at the request of Cameron, and that the amount charged therefor in the account furnished by the libellant was paid by the libellant, and composes part of the bottomry debt. The other claimant, Quincy, denies that Cameron was owner of the ship, and avers that title to the ship was vested in him, (Quincy,) at the time the bottomry was executed, and that Cameron was to become entitled to the ownership only on repayment of the purchase-money advanced by him, Quincy, with commissions, &c. This branch of the case respecting the legal ownership of the ship was not in contestation on the hearing before the court, and the case is accordingly to be disposed of in its present posture, upon the assumption that Cameron was legal owner as well as master, when the bottomry bond was executed.

The ground is, however, taken on the argument, that Cameron assumed in the bond, to act in the capacity of master, and that it was accepted by the bottomry creditor as given by the master alone, and accordingly that the transaction must now be considered an hypothecation by a master, and subject to the rules of law applicable to that particular security. The general principle with respect to a contracting party is, that however he may describe himself or his powers, his contract will have effect according to his actual authority and right in the subject matter, when no specific reserve or restriction is expressed, the obligee being entitled to the full benefit of the stipulations in his favor, so far as the obligor is able to fulfill them. Welsh v. Usher, 2 Hill [S. C.] 168. This benefit may be secured by way of estoppel. When the party making an engagement or representation has no capacity at the time to perform it, and afterwards acquires the ability, he and his representatives will be estopped denying the full force and effect of his undertaking. Com. Dig. "Grant"; Gough v. Bell, 21 N. J. Law, 156; 4 Kent, Comm. 98; 24 Pick. 324. This doctrine, more familiar in the interpretation and force of real covenants and contracts than in those connected with the personalty, still has a common affinity in principle in relation to both, and may, if necessary, be invoked to uphold a charge upon a ship by maritime lien or mortgage, no less than transfers or encumbrances of real estate; restricted possibly in both descriptions of grant, to those which are positive and assuring, and not to mere releases and acquittances. 11 Wend. 110; McCrackin v. Wright, 14 Johns. 193; 1 Cow. 616; Co. Litt. 265b, § 446. Still, if in strictness of legal rules a party assuming a right to act as if he had a particular capacity, which does not belong to him at the time, may not be bound in that capacity if he afterwards acquires it, yet admiralty, exercising, in some measure, the powers of a court of equity, may hold his act or obligation shall have operation as in cases of equity relief, according to the condition of parties at the time the decree is rendered. 9 Paige, 244; [Hepburn v. Dunlop] 1 Wheat. [14 U. S.] 178.

In my opinion, neither in equity nor under the stricter rules of law will a party who gives a bottomry upon a ship in the name and character of master, and was at the time, or afterwards becomes owner of the ship, be permitted to restrict the rights of the bottomry holder at the time of its enforcement merely to those conferred by the authority of a ship-master. He takes all the benefits under it which would have accrued had it been avowedly executed by the owner. Those who come in as subsequent purchasers under the same owner, or holders of claims, or liens, or encumbrances posterior in law to the bottomry security, have no privileges in this respect higher than those of the owner. In this case, in executing the bottomry and hypothecation, Cameron described himself, and professed to contract as master of the ship. It now appears upon his answer, and also on the proofs, that he was at the time absolute owner, subject only to an outstanding mortgage to Quincy, the other claimant. The holder of the hypothecation is accordingly entitled to every advantage derivable from the fact that it was made by one possessing not solely the authority of agent, but that of principal also.

This point being established, the case stands relieved of all questions raised as to the necessity or fitness of items charged as supplies or reparations to the ship, and made part of the bottomry debt, because the owner is held competent to raise money, or secure his debts by a bottomry on his vessel, without regard to the necessity of the ship, or his inability to procure funds by other means. The Smilax [Case No. 17,777]; The Draco [Id. 4,057]; The Mary [Id. 9,187]. It is plain, upon the authorities, that the objection to the validity of this security, for want of adequate power in the bottomry giver so to hypothecate the ship, cannot be sustained. The Barbara, 4 C. Rob. Adm. 1; The Duke of Bedford, 2 Hagg. Adm. 294. Indeed, the bearing of the cases is, that a bottomry by a master, in presence of the owner, is only valid by reason of his implied assent to it ([The Aurora] 1 Wheat. [14 U. S.] 96; The Mary [Case No. 9,187]; Patton v. The Randolph [Id. 10,837]), unless it be given in a case of stringent necessity, and the owner withholds his assent unreasonably (3 Kent, Comm. 172). Nor do I find any authority or principle of law in support of the argument that this bottomry can only stand upon the rightful power of the master, as such, to execute it.

The ancient sea laws regard the master a substitute only for the owner in his absence. They show that he generally has no authority to bottomry his ship in her home port, because the owner is to be presumed present there. Consulato del Mare (Boucher) c. 239, pl. 694. Emerigon refers to various ordinances of maritime states to the

same effect. Contrat a la Gross, c. 3, § 3; Jacobson, 363. The authority in Cameron, in the capacity of master alone, to charge his ship by way of bottomry in a foreign port being irrefragable, it would seem reasonably to follow, that it would be left to his judgment to determine what her necessities, at the time, for the completion of the voyage, might be. Admitting, however, that the courts will scan his acts in the character of master, and determine whether he proceeded prudently in view of the rights of those having interests attached to the ship, by admitting within the bottomry security all the particulars which made up the amount of the debt covered by it, and may also do the same, notwithstanding his legal ownership of the vessel when the equitable and substantial interest is in third parties, leaving no more than a conditional or trust title in him, yet in either such case the secondary or trust interests sought to be protected must be brought forward distinctly in the pleadings by the parties entitled to enforce them. But the rights of parties, in that aspect of the case, are not before the court in this issue between the libellant and the claimant, Cameron. All that is involved in this branch of this controversy is the question of the relative rights of the bottomry creditor and debtor when the dealing for the hypothecation is directly with the ship-owner. The stipulation signed in the cause, as also the admission of Cameron after payment of the bottomry was demanded, proves that the debt due by him to the libellant, and intended to be embraced within the bottomry, was £1,325 11 11, sterling—being £125 11 11 beyond the condition of the bond. This fact gives occasion to one of the objections preferred against the validity of the bond to its full extent. It is contended, that when the bond was executed, but a small part of the debt was due the libellant, and that he is limited in his relief on the bottomry to the amount of the indebtment payable at that time. The ship came into Hull in a disabled state, consigned to the libellant by Cameron. Her repairs and supplies were obtained on the credit of the libellant, part of the bills for which had been rendered and paid when the bond was given, and the ship sailed, and the residue came in and were paid subsequently, but before the bond became absolute. There were also advances of money made by the libellant directly to the master, partly cash in hand and in part by a bill at sight on a house in New York, which was duly honored. It is no way a vital ingredient to a bottomry given by a master that the advances it secures shall precede its execution, even when it purports to protect a direct loan or to secure existing debts, if the credit in either case was upon the faith that a bottomry should be given. 3 Dod. 273; The Virginia, 8 Pet. [33 U. S.] 552. Nor, in my opinion, is its validity affected if it be given after the ship has sailed, provided the debt is at risk. Conrad v. Atlantic Ins. Co., 1 Pet. [26 U. S.] 386. As in this case, the hypothecation was made by the owner himself, there would seem to be no mode of avoiding it left him except to show a total want or failure of consideration to support it. The liabilities of the libellant for the vessel and owner, when the bond was taken, would be an adequate consideration upon which to found a bottomry, although a court of admiralty would doubtless call for proofs that the liabilities had been extinguished by actual payment before it would decree the enforcement of the bond, even on the defence of the owner; and especially so, if it is opposed by other creditors, whose prior liens on the ship or freight might be postponed by the bottomry. The presumption that the dealing with the libellant for this credit was, in its inception, on the understanding that it should be secured by bottomry, is strongly corroborated by the acknowledgment of the master after the bond became payable, that he had given it, and that the whole amount named in it was owing by him. Nevertheless, it was strenuously pressed upon the argument, in favor of the owner, (Cameron,) that a large part of the demand now sought to be recovered arose upon liabilities or transactions between him and the libellant, subsequent to the departure of the ship and the execution of the bottomry, and are not proper subjects for bottomry security.

I do not go into an examination of these allegations, nor consider whether it is competent to an owner to invalidate his personal contract by objections of that character, because the stipulation on file admits the whole balance claimed by the libellant to be justly due, and, as before suggested, the same admission was orally made to the libellant before this suit was brought. The court, seeing in the transaction between the parties that this debt may well be a legal foundation for a bottomry security, will not impeach it, it having been given by the owner himself, upon any presumptions or even positive evidence, which might have availed him had the bottomry been executed by the master in his absence and without his direction.

Upon this state of the pleadings and proofs a decree must be rendered in favor of the libellant affirming the validity of the bond, and directing the whole amount, with the marine interest reserved, to be paid, and that the ship and her freight be condemned therefor, as against the owner and claimant, Cameron; subject, however, to such decree as may be rendered on the defence interposed in the case on the part of the other claimant, Quincy, to the effect that Cameron had no authority to hypothecate the ship in his capacity of owner, further than he could legally charge her in the character of master, as against the claimant, Quincy. Interest also will be computed on the loan and marine

PANAMA (Case No. 10,703)  [18 Fed. Cas. page 1076]

interest, from the day they became payable to this decree, with costs to be taxed.

BETTS, District Judge. The claimant, Quincy, in his answer, interposes no objection to the validity of the hypothecation of the ship by Cameron, nor to the sale of the vessel under it; and admits, so far as he is concerned, that the libellant is entitled to a decree therefor; but he claims that in the distribution of the proceeds of the ship in court, his demand is prior in legal right to that of Cameron. The court having decided that the bond was operative and good for its amount as against Cameron, it remains to be settled between these two claimants, after the satisfaction of the libellant's debt out of the fund in court, which of them is entitled to receive the surplus. Quincy proves a bill of sale, executed upon the purchase of the ship, on the 12th of November, 1844, vesting the nominal title and ownership in him. Other documents and evidence produced in the case, however, show that his right, under the bill of sale, was only that of mortgagee, and that the actual ownership belonged to Cameron. There is, therefore, no foundation for the argument, that he can come in and claim the fund in the character of owner of the ship. He purchased her as agent for Cameron and for him, and he took possession of her as owner. This might, perhaps, make his ownership complete without a bill of sale or other paper title. 3 Kent, Comm. 129; Abb. Shipp. 12, 1829. But the pleadings and proofs in the case show that Quincy never claimed any title or interest in the ship other than that of mortgagee.

For Cameron it is contended, that the court has no jurisdiction over that branch of the subject, because the remedy of Quincy, in his character of constructive mortgagee, must be pursued in the state tribunals. This court being rightfully in possession of the funds representing the ship arrested, must necessarily, as incident to that possession, have power to decide who is entitled to withdraw them from the registry. Andrews v. Wall, 3 How. [44 U. S.] 568. It may, undoubtedly, in cases of great difficulty, retain the funds until the adversary claimants shall have litigated their rights to it by direct suit in this court, or some other proper forum; but this must be matter of discretion, and depending upon the nature of the adversary interests. Ex parte Lewis [Case No. 8,310]; Brackett v. The Hercules [Id. 1,762]; 3 Pet. [28 U. S.] 675; 3 Hagg. Adm. 129. Ordinarily the court hears the case upon summary petition or motion, and pays out or restores the remnants and surpluses according to the right of parties so established before it. Betts, Adm. 119. Outstanding liens of any description on a vessel, may be recognised and satisfied out of her proceeds, so far as they suffice, when she has been condemned in admiralty upon prior liens of a maritime character. Abb.

Shipp. 112, 116, and note; The Packet [Case No. 10,654]; The John, 3 C. Rob. Adm. 288; Gardner v. The New Jersey [Case No. 5,233]; Brackett v. The Hercules [supra]; Harper v. New Brig [Id. 6,090].

The jurisdiction of the court over the subject matter being clear, no reason is discerned why the relief is not equally applicable to cases where no liens exist. The court must exercise that jurisdiction in every case, and must decide the legal ownership of the fund before an order to pay it from the registry will be given. Harper v. New Brig [supra]. But there is no necessity that the order should act at once upon the entire fund; it may be distributed in parts according to the rightful claims of petitioners; and it would seem to be of no moment, if the demand is liquidated and ascertained to be payable by the owner of the remnants, whether or not it is suable in admiralty against the vessel or her owner. This court has, on several occasions, declared that parties entitled to sue in admiralty for the recovery of their demands, may come in by petition upon the footing of such right, and be paid out of remnants in the registry, although they possess no lien upon the property out of which the remnants were obtained. The Triumph [Case No. 14,182], July 27, 1841. It is held in the English courts, that a mortgagee of a ship cannot maintain an action in admiralty to enforce the encumbrance, the hypothecation not being considered one of a maritime character (The Exmouth, 2 Hagg. Adm. 88, note; The Neptune, 3 Hagg. Adm. 132); and probably the same doctrine will be upheld in federal courts; but in both tribunals he is allowed to have satisfaction of the mortgage debt out of the proceeds of the ship in court. The distinction between the right of a mortgagee to attach the ship or impound her proceeds in admiralty, for the satisfaction of a mortgage debt, would appear more a matter of words than of substance. It no doubt takes its origin in the apprehensiveness of the English court, that it may encounter a writ of prohibition in touching a subject of a somewhat dubious nomenclature, the contract of security being a common law obligation and the subject pledged, and probably the consideration of the contract being maritime in its character. Still, without the exercise of such control over the proceeds to be disbursed by the court, so palpable it was that great wrong must otherwise be sustained by the mortgagee, that the court has yielded in part its scruple, and admitted him to recover his money out of the avails of the pledge he held for its security.

The court, by force of its jurisdiction over a maritime lien, very probably posterior in point of time to the mortgage, will have taken away the mortgage pledge, and converted it into money; and if the court, after satisfying the decree, cannot retain the balance of proceeds for the benefit of the mort-

gage charge, they must be transferred to the mortgagor as legal owner, and thus the mortgage creditor be deprived of all remedy upon his encumbrance. I think this court may take cognizance of, and adjudicate upon claims preferred against a fund in court, and distribute that fund conformably to the legal and equitable rights of the respective claimants, without being restrained in the administration of this equity to cases of maritime jurisdiction. Andrews v. Hall, 3 How. [44 U. S.] 568. Whether such jurisdiction will be exercised, must rest in the sound discretion of the court, in view of the complexity or nature of conflicting interests.

This case depends upon documentary evidence, presenting but a single question, essentially one of fact, and I see no reason why the court should decline considering the point, and determining whether the fund shall pass to the mortgagor or mortgagee, without regard to its competency to act upon a mortgage conveyance as a cause of action in admiralty. The other items of demand brought forward by Quincy, set forth in his answer and claim, and also made the foundation of a special petition, are most of them advances for the benefit of the ship, and would compose maritime liens, and be entitled, per se, to the privilege of payment out of her proceeds. The particulars in controversy between these claimants are, first, the validity of the mortgage debt of $5,175, claimed by Quincy; and secondly, the claim of $1,050 paid by Quincy to Schmidt & Balshe in favor of Cameron in relation to a charter-party upon the ship.

It is charged on the part of Cameron, that the mortgage security is void, being founded on an usurious consideration. The usury is alleged to consist in a charge by Quincy of a commission of 2½ per cent. on $12,000, the consideration paid on the purchase of the ship for Cameron, but the title to which was conveyed to him to secure his various advances, amounting to $5,175. The letter of Cameron to Quincy, of Dec. 19, 1844, on the subject of the purchase and conveyance of the ship, concludes him in my opinion, on the fact as to the real ownership, and his liability under the transaction. In that letter he declared the purchase to have been made on his account, and the bill of sale to have been taken in Quincy's name, as security for the acceptance of a draft of $5,175, in part for purchase money of the ship, and commission thereon, and in part for other advances Quincy might make on account of the ship.

The inquiry then is, were the commissions received for services in the purchase of the ship, or were they intended between the parties as a compensation for a loan, beyond the interest reserved and received thereon? The proofs leave no ground to doubt that the commission claimed is the ordinary compensation allowed for similar services, by the long-established mercantile usages of the city. The board of commerce recognise and approve it as a proper and customary compensation in like agencies and negotiations; and it is furthermore in direct proof that 2½ per cent. commission on the purchase price is the customary and well-known allowance to merchants and brokers for buying vessels. This is earned and paid when neither the personal credit nor funds of the agent are employed; and the commission is not regarded as having any relation to advances made or responsibilities assumed by the agent in the negotiation. There is nothing in the evidence inducing a suspicion that this transaction was other than is usual in that description of business. The purchase was bona fide at the instance and for the benefit of Cameron, and would seem to have been regarded as advantageous to him in its terms, for the ship was immediately insured for his benefit at $14,750, $2,750 above the consideration paid. The point, whether charging a commission or compensation for services in connection with the loan of money, and also legal interest upon the loan, amounts to usury, has been largely discussed in the books, and with great diversity of opinions. In the decisions in the courts of this state the subject has been thoroughly examined, and it may now be considered settled by the judgment of those tribunals, that taking, in the usual course of business, the customary and appropriate commission for services actually performed, although accompanied also with the advance of money upon which interest is reserved, does not constitute a violation of the laws against usury, unless an usurious purpose and intention in the proceeding is proved, and will not vitiate a credit or loan, on interest, concomitant upon such service. Trotter v. Curtis, 19 Johns. 160; Suydam v. Westfall, 4 Hill, 218; Ketchum v. Barber, 4 Hill, 224. The like principle is declared in Connecticut. De Forest v. Strong, 8 Conn. 522.

The evidence in this case shows that the intervention of Quincy in the purchase of the ship was according to ordinary mercantile transactions of the kind, and the interest he stipulated to have in the after business of the ship, in procuring freight, receiving her consignments and making the necessary insurances and advances in her employment upon accustomed allowance, strongly indicate that the arrangement was legal and fair, and not for the purpose of securing and covering an illegal interest on the loan. I shall accordingly pronounce for the mortgage debt, with interest, as not affected by the allegation of usury. The stipulation between the parties of the 19th of December, 1844, also binds the ship as collateral security to Quincy, for any other advances he might make to Cameron on her account, with the regular charges thereon. This clearly embraces the disbursements for insurance and commissions therefor, towing or pilotage to sea, filling water casks on board, and $500 cash advanced to Cameron, to provide for disburse-

ments in behalf of the ship on her homeward voyage. Those particulars compose the items of Quincy's account, amounting to $8,569 49, except $1,050 alleged to have been paid Schmidt & Balshe, for advances made by them on account of a charter-party for a voyage to Stettin, with commissions, &c., and $200 paid George Marshall for loading her. The last item was a stevedore's bill for stowing the cargo taken on board under the charter-party to Stettin.

On the 14th of July, 1845, Cameron executed a charter-party on the ship for a voyage to Stettin, in favor of Schmidt & Balshe of this city. It is unnecessary to rehearse the circumstances leading to the engagement of the ship, or the considerations expected to be realized. When the charter-party was executed, the existence of the bottomry bond to the libellant was known to all parties, and that it was in the hands of the agents of the libellant, in this city, ready to be enforced against the ship. A verbal arrangement or understanding was had with the agents, that on the payment to them of $3,500 when the ship became ready for sea, she might make the voyage without molestation on account of the balance due upon the bottomry loan. The charterers loaded the ship under the charter-party, and advanced to the master and for the ship, $1,114 41, but the $3,500 not being paid to the agents of the bondholder, they caused her to be arrested when hauled out and ready for sea. Schmidt & Balshe, the charterers, thereupon demanded the repayment of their advances, and satisfaction for the breach of contract, and an arrangement was made, under which Quincy paid them $1,050 in full satisfaction of their advances, and took their assignment to himself of that demand, and the purchaser of the ship under the bottomry sale then permitted her to perform the voyage under the charter-party. Quincy claims he is entitled to receive that $1,050 out of the proceeds, as a demand chargeable upon the ship, or as comprehended within the stipulation of December 19, 1844. If this sum of $3,500 was to be paid absolutely in advance as the price of hiring the ship or the liquidated compensation for transporting the cargo, there might, perhaps, be grounds for concluding that the charterers took upon themselves the risk of the voyage being performed, and could not, in case of its failure, compel the repayment of the money. 4 Maule & S. 37; Watson v. Duykinck, 3 Johns. 335. The rule generally applicable to advances of freight is, undoubtedly, that the shippers can recover it back if the cargo is not transported and delivered conformably to the contract. Detouches v. Peck, 9 Johns. 210, 212, note. This charter-party does not stipulate a gross sum for the hire of the ship. The engagement of the charterers is to pay certain specified rates of freight, "for the charter or freight of the vessel during the voyage," with five per cent. primage. Another memorandum in writing is, "At Stettin, &c., consign to friends of charterers. subject to 2½ commns., on amount of freight in one place only." "$3,500 to be advanced in N. Y., on the freight, when the vessel is loaded, for which a draft is to be given on Stettin at the rate of 67c. per Prussian rix dollar, and policy of insurance for same, to be handed over as security. Five per cent. comms. on freight to be paid here."

It is manifest, upon these stipulations, that this was an ordinary case of affreightment, leaving the respective parties under the obligations usually attaching to that contract, and that the reserve of part of the freight here did not vary the liability of either party towards the other in respect to the performance of the contract. If upon the principles of the maritime law, the charterer has a right to hold a vessel liable for the repayment of freight advanced when the voyage has not been performed, or goods delivered, Schmidt & Balshe, in this case, would have possessed such lien, because, as between them and Cameron, the charter-party had been annulled by his failure to discharge the bottomry lien, and Quincy, by their assignment of that demand, would have become entitled to their privileges and remedies thereon. This point is not free from difficulties. To a certain extent the engagements in charter-parties are undoubtedly to be regarded as personal only, and not real, or affecting the vessel. Such would be stipulations to take cargo on board, to surrender up designated portions of the ship, to have her at particular places at particular times to receive her lading, &c., &c. There can be no better reason for enforcing in rem such contracts than those for buying a ship for a given service, or having her equipped for it at a time fixed; or that she shall be provided with certain documents in order to be freighted, such as a warranty of national character, a clean bill of health, free of contraband of war, &c. Agreements of that character would acquire no higher effect by being inserted in a charter-party than if contained in a bill of sale or other contract; and I am aware of no authority upon which claims of that description could be prosecuted in admiralty courts against the ship, nor do I regard those engagements coming within the jurisdiction of the court in suits in personam.

In the present case, the owner would have had a lien on the goods on board for the freight, and the reciprocal lien of the shippers on the ship for the delivery of the cargo would attach in their favor. [Gracie v. Palmer] 8 Wheat. [21 U. S.] 605; Drinkwater v. The Spartan [Case No. 4,085]; [Marcardier v. Chesapeake Ins. Co.] 8 Cranch [12 U. S.] 49; Certain Logs of Mahogany [Case No. 2,559]; The Nymph [Id. 10,389]; The Paragon [Id. 10,708]. Had the cargo

not been delivered according to the terms of the charter-party, the shippers would clearly then have a right upon their bills of lading, and also upon the charter-party (Certain Logs of Mahogany [supra]; The Volunteer [supra]), to proceed in rem against the vessel for the amount of their interest and the losses thereon (Andrews v. Wall, 3 How. [44 U. S.] 568). In such case the loss would not only be the value of the goods, but also the freight paid for their transportation, and both items would be recoverable. The ship becomes answerable for the safe keeping and safe delivery of the cargo from the time it is placed on board. Abb. Shipp. 222. The freight, when advanced, may reasonably be regarded as constituting part of the value of the cargo, which the ship is thus bound to deliver to the freighter; and the two united would compose the encumbrance or lien for which a freighted vessel stands responsible. On the sale of the ship and breaking up of the voyage, by fault of the owner, the shipper of the cargo could have attached her in the hands of the purchaser as subject to that double lien: 1. For the return of the cargo or its value; 2. The repayment of the freight advanced; and the purchaser would clearly have been allowed the amount of such liens, to be deducted from the sum of the purchase-money. The whole purchase-money being paid into court, the adjustment of the rights of the parties in respect to it will now be the same as if it had been retained by the purchaser to await the judgment of the court, and be paid pursuant to judicial directions.

Accordingly, I am of opinion that Schmidt & Balshe acquired a lien upon the vessel to the amount of the freight advanced by them under the charter-party. That privilege passed to Quincy under their assignment, and he can, since the sale of the vessel, enforce the right against her proceeds in court, to the amount of his loss, which, in this case, is to be measured by the amount of his actual payment on the assignment, $1,050, that being the liquidation of the damage by the parties. The sum of $200, paid by Quincy to Marshall, the stevedore, is disallowed. This court has repeatedly held that stevedores do not rank above shore laborers, and have no more lien on the vessel for stowing cargo than carmen have for bringing it to the ship, or the wharfinger for hoisting it on board. Their contracts are personal with the master or owner, and their remedy must be against their employers. This claim cannot be admitted under the authority of the stipulation of December 19, 1844, because the payment was not made to Cameron or by his request, nor was it on account of the ship, she not being responsible for it. The decree will be that Quincy be allowed and paid, out of the proceeds in court, his account, to the amount of $8,369 49, (including the mortgage loan,) with interest from the time of payment or advance of the respective items by him. There yet remaining various petitions against the fund in court, the residue of it, after satisfying this order or decree in favor of Quincy, will be retained in court until it be determined whether the sums claimed by the petitioners are chargeable solely against Cameron personally, or they attach to the whole balance undisposed of, as proceeds representing the vessel. Reference was made on the argument to policies of insurance held by Quincy, and a deduction or allowance was claimed to be due Cameron on that account. The facts have not been brought out on that point so as to enable the court to dispose of it, and this decree is to be considered as leaving the rights of the parties in this behalf unaffected.

A decree was entered in the cause in accordance with the principles laid down in the foregoing decision.

[NOTE. Certain creditors of the master filed a libel and petition, seeking to have the remnants of the Panama paid to them in satisfaction of their debts, alleging they have a prior equity to the balance of the proceeds remaining after the vessel was sold in conformity with the above decree. The application was denied. Case No. 11,697.]